## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 21-CR-484 (RDM)** |
| **v.** | : | |
| | : | |
| **MICAJAH JOEL JACKSON,** | : | |
| | : | |
| **Defendant.** | : | |

### GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Micajah Joel Jackson to a sentence of sixty days incarceration, thirty-six months' probation (to include mental health treatment), and $500 in restitution.

### I.      Introduction

The defendant, Micajah Joel Jackson, is a twenty-six-year-old veteran of the Marine Corps who participated in the January 6, 2021, siege of the United States Capitol. That day, a mob—of which the defendant was a member—carried out a violent attack that interrupted the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than one million dollars of property damage.

Jackson pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building. As explained herein, a sentence of sixty days incarceration followed by thirty-six months' probation is appropriate in this case because: (1) since January 6 and even since his guilty plea, the defendant has demonstrated a complete lack of remorse for his conduct; (2) since January 6, defendant has continuously spread and vehemently

defended false information about the nature and circumstances of January 6, minimizing the violent nature of the attack and using his social media presence to propagate a false flag[1] theory; (3) he was aware of the potential for violence as demonstrated by the fact that he brought a backpack with him that contained medical supplies; (4) he was one of the first rioters to breach the West Plaza and can be seen shouting "Oathbreakers! Oathbreakers!" repeatedly at law enforcement while walking next to Ethan Nordean, allegedly one of the leaders/organizers of the Proud Boys[2]; (5) he gave incomplete and inaccurate information to the U.S. Probation Officer attempting to write the Presentence Investigation Report; and (6) even while on conditions of release, he has tested the limits of compliance, traveling on at least one occasion to a state without reporting the travel to the local U.S.P.O. providing courtesy supervision; and (7) he confronted and filmed a private citizen that he suspected to be a government informant.

Jackson relies on the argument that he did not personally engage in violence or property destruction before entering the Capitol or while he was inside the Capitol on January 6, 2021. While Jackson's non-participation in felony-level crimes is a good thing, the argument is inapt in this context. If he *had* committed acts of violence against law enforcement or engaged in property damage or destruction, he would have been charged with felony offenses. Any restraint Jackson showed on January 6 is a reason why he is not facing felony charges, and not a mitigating factor to his misdemeanor charges.

Jackson did encourage and celebrate the violence of that day while downplaying the seriousness. He did so on January 6, 2021, and he continues to do so on near constant basis through

---

[1] False flag "refers to a hostile or harmful action (such as an attack) that is designed to look like it was perpetrated by someone other than the person or group responsible for it" but can also refer to "something used to misrepresent motives or identity." https://www.merriam-webster.com/dictionary/false%20flag

[2] Ethan Nordean (aka Rufio Panman) and self-described "Sergeant of Arms" of the Proud Boys is charged under 21-CR-175 (TJK).

today. On January 24, 2022, a German internet personality published a lengthy interview with Jackson. In that interview, Jackson made numerous false and misleading statements about the 2020 election, the events of January 6, and even the procedural status of this case. For example, he claimed, "I plead no contest to a Class B misdemeanor, 'Parading, Picketing, & Demonstrating.'"[3] Jackson did not plead "no contest." Jackson pleaded guilty and accepted full responsibility for the actions he is accused of committing.

The Court must also consider that the defendant's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement, breach the Capitol, and disrupt the proceedings. But for Jackson's actions alongside so many others, the riot likely would have failed. Here, Jackson participated in a riot that tried to and succeeded in halting the Congressional certification. Jackson prepared for violence on January 6, and from that day through the present, he has shown a lack of remorse, and a potential for future violence. This behavior renders a sixty-day term of imprisonment followed by a thirty-six-month term of probation both necessary and appropriate in this case.

## II.     Factual and Procedural Background

### a.   The January 6, 2021, Attack on the Capitol

To avoid exposition, the government refers to the general summary of the attack on the U.S. Capitol that the parties agreed to as part of the Statement of Offense. ECF No. 19, ¶¶ 1-7. Just as each grain of sand on a beach is still part of that beach, each participant in a riot is still part of that riot. From the most mundane actions to the most violent, each rioter contributed directly and indirectly to the violence and destruction of that day, including Micajah Joel Jackson.

---

[3] https://vickyrichter.com/?p=408.

### b.   *Micajah Joel Jackson's Role in the January 6, 2021, Attack on the Capitol*

Much of Jackson's actions have already been presented in significant detail to the Court in the Statement of Facts that the government filed to initiate this case, and the government adopts the same into this sentencing memorandum. *See* ECF No. 1-1, pp. 2-16. One of the screenshots that should be added is one used by the New York Times in a video released as part of their Visual Investigations series.[4]



**IMAGE 1:** *Jackson (left with plaid shirt, yellow gloves, American flag, and orange armband) shouts "Oathbreakers! Oathbreakers! at law enforcement while walking across the West Plaza of the Capitol with separately charged defendant Ethan Nordean (see fn. 2) just behind Jackson and to his left wearing a backwards baseball hat and reflective sunglasses.*

---

[4] The New York Times, *Day of Rage: How Trump Supporters Took the U.S. Capitol | Visual Investigations*, YOUTUBE (Jul. 1, 2021), https://youtu.be/jWJVMoe7OY0 at 11:47.



*IMAGE 2: Jackson (in red rounded square) is seen from U.S. Capitol Police CCV in approximately the same location and at approximately the same time (12:59 PM) as IMAGE 1.*

As far as Jackson's conduct is concerned, the moment captured in Images 1 and 2 appears to be when he's at his most aggressive towards law enforcement. Jackson's behavior for the next hour includes running away from the line of law enforcement while warning others, "They're spraying!"; being near an explosion/flashbang device; then continuing to point to and move towards the NW Scaffolding and the NW Plaza. At approx. 2:16 PM, CCV captures Jackson ascending the NW Stairs, and at 2:22 PM Jackson entered the U.S. Capitol via the Senate Wing Door. The next eighteen images show him ascending the NW Stairs and then follow Jackson's progression through the Capitol, a journey that took approximately thirty minutes from entrance to exit.



*IMAGES 3, 4: (left to right) At 2:16 PM, USCP CCV captures Jackson ascending the stairs that lead from the West Plaza up to the NW Plaza and the entrance to the Capitol via the Senate Wing Door. The photo to the right is a photo Jackson provided to Vicky Richter during their interview on January 24, 2022.*



*IMAGE 5: At 2:22 PM, Jackson entered the Capitol.*



***IMAGES 6, 7:*** *(left to right) USCP CCV captured the image on the left and a video that Jackson appears to have captured the image on the right, which is itself a screenshot from a video that Jackson appears to have provided to Vicky Richter. As can be seen, Jackson is filming a man climbing through a broken-out window, there are piles of broken glass and debris strewn about, and one can hear an alarm in the background.*



***IMAGE 8:*** *At 2:25 PM, Jackson was present in the Capitol Crypt when the rioters overwhelmed law enforcement and continued their invasion of the Capitol.*



*IMAGE 9:* *At 2:29 PM, Jackson is still in the Crypt.*



*IMAGE 10:* *At 2:33 PM, Jackson walks south through the Crypt and exits towards the first floor House Wing.*



**IMAGE 11:** *At 2:33 PM, Jackson enters the Small House Rotunda and ascends to the second floor via the staircase in the vicinity of the Memorial Door.*



**IMAGE 12:** *At 2:36 PM, Jackson, now on the second floor, walks south through Statuary Hall towards the House Chamber.*

 

***IMAGES 13, 14:*** *At 2:37 PM, Jackson and the rest of the rioters are momentarily held back by a line of law enforcement. Moments later, the line was overwhelmed and rioters, including Jackson, made their way to the door of the House Chamber. Jackson appears to have taken the photo at right and submitted it to Vicky Richter.*



***IMAGE 15:*** *At 2:43 PM, Jackson is at the door of the House Chamber.*



**IMAGE 16:** *At 2:46 PM, a chemical irritant is deployed, and Jackson begins walking north, retracing his steps through the Statuary Hall Connector.*



**IMAGE 17:** *At 2:46 PM, Jackson continues walking north through Statuary Hall.*



**IMAGE 18:** *At 2:49 PM, Jackson enters the Great Rotunda.*



**IMAGE 19:** *At 2:51 PM, Jackson exits the Great Rotunda and walks towards the East Rotunda Door.*



*IMAGE 20: At 2:51 PM, Jackson exits the Capitol through the East Rotunda Door.*

These images show Jackson's path through the Capitol and contradict statements Jackson has repeatedly made after January 6, 2021. For example, in the recent Vicky Richter interview, Jackson states, "I went to Washington D.C. only to document the rally, expose propaganda, and observe certain groups and demonstrators." On January 6, however, his documented actions and behavior should lead this Court to view such claims with extreme skepticism.

Throughout his time on restricted grounds and inside the Capitol, Jackson behaves as a rioter. He enters the Senate Wing Door just eight minutes after it was first breached. He is in the Crypt when rioters breach the line of law enforcement. He is at the Statuary Hall Connector when rioters overrun law enforcement and attempt to break into the House Chamber. The apparent reason for his retreat is the deployment of a chemical irritant.

From the time Jackson stepped onto the restricted grounds of the Capitol to the time when he left the East Rotunda Door, approximately two hours passed. Jackson was exposed to a chemical irritant on the West Plaza, and yet he continued forward. He encountered flashbangs and lines of law enforcement resisting the rioters, and yet he continued forward. He went inside the Capitol,

saw folks climbing through windows, heard alarms, and saw broken glass and debris, and yet he continued forward. He was in the Crypt as rioters shouted and chanted and then violently overran law enforcement, and yet he continued forward. It was only after he was exposed to a chemical irritant for the second time while part of a crowd that was attempting to break into the House Chamber that Jackson finally turned around and left the Capitol.

### c.  *Jackson's Actions Post-January 6*

In early 2021, after being interviewed by the FBI in a non-custodial setting, Jackson shared a post through Instagram where he claimed that he was being persecuted by the FBI. ECF No. 1-1, p. 15. Even though that account (@thejfkreport) was shut down by Instagram, the defendant has created new accounts, to include @jfkreport (334 followers) and @conservative_embassy (3,195 followers) (an account he co-runs with an individual he identifies as "CH"). Both are public accounts.

He also has a Twitter account (@thejfkreport (6,564 followers)) that was created in May 2021 and already has 28.1K Tweets, according to the public available information at https://twitter.com/thejfkreport. Using the @thejfkreport handle, the defendant also claims to have Gab[5] (1.2K Gabs, 161 followers), Gettr[6] (1,761 followers), Telegram[7], YouTube[8] (727 subscribers, total video view count of 16,084)), and Rumble[9] (146 subscribers) accounts. The Court should take note that while speaking to the U.S. Probation Officer preparing this report, the defendant reported only one social media account, specifically his Twitter account, @thejfkreport. It also

---

[5] https://gab.com/thejfkreport

[6] https://gettr.com/user/thejfkreport

[7] https://t.me/The_JFK_Report

[8] https://www.youtube.com/c/TheJFKReport/featured

[9] https://rumble.com/user/TheJFKReport

appears that prior Twitter accounts (@micajahjackson) have been suspended. Sometimes the content on these sites is duplicative, and other times not.

In addition to his own social media presence, the defendant often gives interviews to others. On June 2, 2021, Jackson gave a 16 minute 50 second interview that was posted on Rumble to a verified account with the handle @StewPeters.[10] The title of that video is "Marine Charged by FBI in Unconstitutional Witch Hunt as Biden DOJ Targets Trump Supporters."

On August 14, 2021, Jackson gave a 47 minute 13 second interview that was posted on Rumble to an account with the handle @stephenehorn.[11]

On January 15, 2022, Jackson gave a 10 minute 48 second interview that was posted to an account with the handle @thegatewaypundit.[12] The title of that video is "J6er Micajah Jackson Talks with Gateway Pundit After He Confronted Luke Robinson" and so far is has been viewed 23,255 times.

On January 18, 2022, a Getter account with the handle @helpstophate posted a 52 minute 18 second interview with the defendant.[13]

Although Jackson has created and taken part in the creation of more publicly available content than can be included in this memorandum, he has been consistent in his claims. In the previously mentioned January 24, 2022, interview with Vicky Richter, Jackson claims that the whole of January 6 was a psyops, or a psychological operation, defined generally as a military operation "usually aimed at influencing the enemy's state of mind through noncombative means

---

[10] https://rumble.com/vhy21n-marine-charged-by-fbi-in-unconstitutional-witch-hunt-as-biden-doj-targets-t.html

[11] https://rumble.com/vl5cvk-interview-w-micajah-jackson-j6-defendant.html

[12] https://rumble.com/vsmbbl-j6er-micajah-jackson-talks-with-gateway-pundit-after-he-confronted-luke-rob.html

[13] https://rumble.com/vsug44-discussion-island-episode-61-micajah-jackson-01182022.html

(such as distribution of leaflets)."[14] At one point, Jackson stated, "Our own United States federal government participated in an 'American Psyop' on its own citizens to promote totalitarianism. This anti-American psyop will forever be known as the Washington Massacre."

In the same interview, which includes Jackson's photos and videos from his time at the Capitol, Jackson also claimed that USCP officers were beating "children, women, and elderly people who were simply standing there;" that "[i]nside [the Capitol] were government officials taking selfies, hugging the protesters, and giving them high-fives;" and that "Officer Harry Dunn was randomly hitting people with his baton while being protected by Oath Keepers." Jackson also blamed the violence and destruction of property that day on ANTIFA. None of these claims are supported by the many photos or video Jackson took or by the large amount of surveillance footage that shows Jackson's path. Instead, all available evidence shows Jackson at the vanguard of a mob, shouting at law enforcement officers and witnessing violence being perpetrated against them as they attempt to defend the public servants within. Then, taking advantage of the violence of the crowd surrounding him, Jackson continues to advance further into the United States Capitol Building.

Most recently, Jackson gave a 26 minute 26 second interview to the podcast The Political Prisoner, presented by Look Ahead America that dropped on February 11, 2022.[15] In this interview, Jackson reiterates many of his beliefs about being persecuted, but towards the end, he also describes a video where he, in his own words, "confronted" a private citizen and accused him of being an FBI informant.[16] The Jackson also encourages listeners to donate to his legal defense

---

[14] https://www.merriam-webster.com/dictionary/psyops

[15] https://open.spotify.com/episode/6Ak9whXxiFpzlPftocgBNP?si=rPfkEzRtRR6vpgBYNhrTFA

[16] https://twitter.com/TheJFKReport/status/1482072575085723649

even though he was appointed a Public Defender from the District of Columbia. He says that as to any money received,

> That's going to be for legal costs, paying the fines they're going to give me, or if they're going to come after me even more for exposing [the private citizen] because after . . . so I got my sentencing document last week, and in the document the government said that I actually interrogated, they put in my document that I interrogated a suspected government informant, so I don't know if they're going to try to come after me I get sentenced or . . . [17]

To date, the referenced fund has $2,182.

Before January 6, 2021, Jackson also posted the following undated photo[18] to his now suspended Twitter account (@micajahjackson):



*IMAGE 21: Jackson posted this undated selfie-style photograph to his now suspended Twitter account.*

Another condition of pretrial release that Jackson may have violated is the condition requiring, "Defendant must notify Pretrial Services in advance of any travel outside the District of Arizona." ECF No. 8, p. 3. On September 16, 2021, the defendant appears to have traveled to Rifle,

---

[17] https://open.spotify.com/episode/6Ak9whXxiFpzlPftocgBNP?si=RiY7_-fpTXOqFTItUGO6Gw

[18] https://twitter.com/Khiaroskuro/status/1274876797037867009/photo/1

Colorado, as shown by the geo-tagging from his Tweet.[19] On information and belief, the local U.S. Probation Officer providing courtesy supervision was not notified about these travels. The government would have brought this to the attention of the Court, but only now became aware of them.

To say there is a lot for this Court to consider when crafting a sentence for Jackson is an understatement. For all the reasons set forth below, the government believes that a sentence of sixty days incarceration followed by thirty-six months' probation (to include compliance with mental health) and $500 in restitution is sufficient but not greater than necessary.

### III.    The Charges and Plea Agreement

On May 14, 2021, Micajah Joel Jackson was charged by complaint with violating 18 U.S.C. §§ 1752(a)(1), (a)(2); and 40 U.S.C. §§ 5104(e)(2)(D) and (e)(2)(G). On May 18, 2021, he was arrested in Phoenix, Arizona. On July 21, 2021, Micajah Joel Jackson was charged by four-count Information with 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On November 22, 2021, he pleaded guilty to Count Four of the Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in a Capitol Building. By plea agreement, Micajah Joel Jackson agreed to pay $500 in restitution to the Department of the Treasury.

### IV.    Statutory Penalties

The defendant now faces a sentencing on a single count of 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to six months of imprisonment and a fine of up to $5,000. The defendant must also pay restitution under the terms of his or her plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545

---

[19] https://twitter.com/TheJFKReport/status/1438540120194490384;

F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### V.      Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the 3553(a) factors weigh in favor of incarceration with a significant term of probation.

### VI.     The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021, is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was the one of the only times in our history when the Capitol building was occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on their individual conduct, this Court should note that each person who entered the Capitol on January 6 without authorization did so under extreme of circumstances. Each person who entered the Capitol that day would have crossed through numerous barriers and barricades and heard the cries and ululations of the mob. Depending on the timing and location of their approach, they also may have observed extensive fighting with law enforcement officials and smelled or felt the sting in their eyes of chemical irritants deployed by both rioters and law enforcement. No rioter was a mere tourist that day.

Additionally, while looking at the defendant's individual conduct, we must assess such conduct on a spectrum. This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from law enforcement officials; and (9) whether the defendant demonstrated sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.

To be clear, had the defendant personally engaged in violence or destruction, he would be facing additional charges and penalties associated with that conduct. The absence of violent or destructive acts on the part of the defendant is therefore not a mitigating factor in misdemeanor cases, nor does it meaningfully distinguish the defendant from most other misdemeanor defendants. The defendant's lack of violence and property destruction explains why he was charged only with, and permitted to plead to, a misdemeanor offense rather than felony.

As is evident from everything that is known about Jackson, he is proud of his status as a veteran of the Marines, he has a driving passion for politics and political discourse, and his style is arguably that of a provocateur. Videos from various sources and criminal cases show thousands of individuals marching to and breaching the U.S. Capitol. He joined the crowd, marching, shouting, and chanting. One of the first things Jackson himself did when he first encountered law enforcement was to get in their face and call them oath breakers.

On January 6, 2021, as a veteran of the Marine Corps, Jackson was aware of the jeopardy posed by violent entry into a secured location, just as the rioters violently entered the Capitol. Jackson was also aware of the violence required to make that entry into the Capitol. Jackson specifically confronted those attempting to protect the Capitol by repeatedly calling them oath breakers, and then pushed forward when law enforcement attempted to secure the perimeter and hold back the tide of rioters.

Jackson entered the building approximately eight minutes after it was first breached at the Senate Wing Door. While no police officers blocked his path, there were clear signs of violent entry. The windows adjacent to the door through which Jackson passed had just been smashed out and an alarm was blaring. Jackson took a moment to film another protester jumping through a broken window for social media. Jackson was present in the Capitol Crypt when rioters confronted and breached a line of law enforcement. During that time, publicly available videos and videos recovered from other defendants show rioters shouting vile and violent rhetoric. For example, while in the Crypt at the same time as Jackson, and immediately prior to the breach of the line of USCP officers, a separately charged defendant[20] who is about twenty feet away from Jackson shouts,

> **SIMON:** This is what a revolution looks like folks. Yup. This is history right here.
>
> **UNIDENTIFIED INDIVIDUAL:** [off screen] Fucking traitors!
>
> **SIMON:** This is what . . .  this is what a tyrannical government gets treated like. We bust in this bitch and show them who the fucvin' boss really is . . . This is what a revolution looks like folks. This is what happens when the people are fucked with over and over and over again. Fucked with over and over again. This is what happens when the people get tired of it.

---

[20] *United States v. Glen Mitchell Simon*, 21-CR-346 (BAH)

**SIMON (cont.):**      They fuckin' bust that fuckin' door down. My boys busted the windows in, busted the door down, and we started pouring in here.

This is our house. This is our house, folks. This is what a revolution looks like. This is what happens. This is what gets shit done. You barge up in their shit and show them who's boss.

[chanting with other rioters] USA! USA!

[recording USCP officers holding their line] They're all terrified. This is what happens. This is what happens, folks! This is what happens! When the people get tired, this is what happens! You gotta show these fuckers we ain't fuckin' around! This is the only way to get it done! FEAR! You gotta scare the fuck out of them!

For those of you who are just now tuning in, the door, the front door got kicked down, the windows got busted out [clears throat], the windows got busted out, and we started pouring up in this motherfucker.

I guess . . . I guess we . . . huh? I dunno. There's at least, fuck. There's at least a thousand of us in here. They only, they listen to antifa, and Black Lives Matter. This is how they do shit, so this is how we're gonna do it!

Alright folks, I think we're gonna make another charge. I'll fill ya in, I'll fill ya in once we go.[21]

Accordingly, the nature and the circumstances of this offense and the defendant's participation and role in the events of January 6, 2021, establish the clear need for a sentence of sixty days incarceration followed by thirty-six months' probation in this matter.

## VII.    The History and Characteristics of the Defendant

As set forth in the PSR, Jackson does not appear to have any criminal history. Jackson has stated publicly numerous times and confirmed to the U.S. Probation Officer that he served in the

---

[21] To be perfectly clear, the government is not alleging that Jackson made or explicitly adopted this statement. It is being used as one of many examples of the kind of rhetoric that was rampant during the rioters' infestation of the Capitol.

Marine Corps. He enlisted in 2015 and was discharged in 2017. The government has no reason to doubt the representations made about the conditions of his discharge as represented by the U.S. Probation Officer and defense counsel and relies on those representations. Following his service, Jackson had brief periods of employment with various employers, but nothing long-term. Jackson's main source of income now is disability income.

In terms of specific deterrence, it is unclear what sentence will have the greatest impact on Jackson. Jackson's social media has shown that he has been emboldened by being charged and processed through the criminal justice system. He constantly refers to himself and other Capitol siege defendants as martyrs[22], even while teaming up to "confront" another private citizen[23]— filming in their face with cellphones—who he believes was also part of the siege. So much of Jackson's behavior prior to January 6, during January 6, and especially after January 6 has been incongruous and confounding. When interviewed by FBI agents, he tearfully admitted to his conduct, thanked them for helping him get to the VA hospital for mental wellness, but then gets behind a keyboard and tells anyone who will listen that the "FBI = KGB" and that he "hope[s] FBI agents are not getting laid by their wives for being commie pieces of shits."



TheJFKReport @TheJFKReport · 22m
FBI = KGB. Jail = Gulag. Freedom = Communism. It's here America. Communism has stepped through our door step.

💬     🔁 2     ♡ 3     ↥

---

[22]    https://www.usatoday.com/story/news/local/arizona/2021/05/22/arizona-man-arrested-us-capitol-riot-says-he-being-politically-persecuted/5208354001/?gnt-cfr=1

[23] https://twitter.com/TheJFKReport/status/1482072575085723649?s=20



Jackson wrote what he calls "a sincere letter" to the Court on February 1, 2022, in which he recognizes that his "actions require consequences by the rule of law to be held in our country." This is good, because as discussed below, the sentence crafted by this Court should reflect the seriousness of the offense and *promote respect for the law*.

However, on Twitter, on the same day he signed that letter directed at this Court, Jackson, who just told the Court that he believes that his actions require consequences "for the rule of law to be held in our country" Tweeted, "Every cop is a criminal."[24] Three days later, he Tweeted at Sen. Mitt Romney to "Fuck off"[25] in response to Senator Romney's Tweet referencing two members of the bipartisan January 6 Select Committee.[26]

In his letter to the Court, Jackson further claims to recognize, "The day is coming when I will have to face the court for sentencing. I will humbly accept any sentencing the court decides that fits my punishment." On February 4, 2022, just three days later, the defendant references the sentencing of another Capitol riot defendant—"Cleaned record, disabled veteran, no threat to self or society"—who received a $500 fine and $500 order of restitution.[27] [28] The defendant then expresses a lack of faith in this Court, stating the he expects to be "tossed to the wolfs [sic]."[29]

---

[24] https://twitter.com/TheJFKReport/status/1488609865308069889

[25] https://twitter.com/TheJFKReport/status/1489685771674009603

[26] https://twitter.com/MittRomney/status/1489611374930141184

[27] https://twitter.com/TheJFKReport/status/1489671766792228868

[28] *United States v. William Blauser, Jr., et al.*, 21-CR-386 (TNM)

[29] *Id*.

Given this defendant's unique life and circumstances, the government does not believe that a lengthy term of incarceration is necessary. It does, however, believe that the history and characteristics of the defendant, especially the fact that he consistently uses incendiary rhetoric and has shown a pattern of nonchalance towards the Court, require a sixty-day term of incarceration followed by thirty-six months of probation.

### VIII. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[30] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-CR-238 (TFH), Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan). *United States v. Gary Laird Wickersham*, 21-CR-606 (RCL), Tr. 12/21/21 at 16-17 ("Because my assessment of the seriousness of the crime here is such that even for people who just were there for a short period and who walked through, the seriousness of what happened that day and the reaction of people and the public to what happened that day, and the effect on the country is such that the courts have to treat it as a serious offense. And the courts have to ensure that the deterrent value of our sentencing laws are such that we deter others in the future -- not just you, but others

---

[30] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20Testimony.pdf.

in the future from engaging in that type of conduct so that there have to be consequences")
(statement of Judge Lamberth).

### IX.   The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime
generally, and specific deterrence, or the need to protect the public from further crimes by this
defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir.
2010).

#### a.  *General Deterrence*

The demands of general deterrence weigh in favor of incarceration, as they will for nearly
every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most
compelling reason to impose a sentence of incarceration. For the violence at the Capitol on January
6 was cultivated to interfere, and did interfere, with one of the most important democratic processes
we have: the peaceful transfer of power to a newly elected President. As noted by this Court during
sentencing, in *United States v. Paul Hodgkins*, 21-cr-188 (RDM):

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack
> the Capitol to prevent our elected officials from both parties from performing their
> constitutional and statutory duty, democracy is in trouble. The damage that [the defendant]
> and others caused that day goes way beyond the several-hour delay in the certification. It
> is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven
months ago for the United States and our diplomats to convince other nations to pursue democracy.
It means that it will be harder for all of us to convince our children and our grandchildren that
democracy stands as the immutable foundation of this nation." *Id.* at 70; *see United States v.
Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37 ("As other judges on this court have
recognized, democracy requires the cooperation of the citizenry. Protesting in the Capitol, in a
manner that delays the certification of the election, throws our entire system of government into

disarray, and it undermines the stability of our society. Future would-be rioters must be deterred.")
(statement of Judge Nichols at sentencing).

The gravity of these offenses demands deterrence. This was not a protest. *See United States*
*v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be
made defending what happened in the Capitol on January 6th as the exercise of First Amendment
rights.") (statement of Judge Moss). Similarly, this was not, despite defendant's repeated assertions
to the contrary, a PsyOps. And it is important to convey to future potential rioters—especially
those who intend to improperly influence the democratic process—that their actions will have
consequences. There is possibly no greater factor that this Court must consider.

### b. *Specific Deterrence*

Jackson's words, post-arrest interview, and especially his post January 6 statements on
social media and interviews clearly demonstrate the need for specific deterrence for this defendant.
He marched with the Proud Boys from the Washington Monument to the Capitol. He heard their
chants and cries. He was there on the front line of the West Plaza as the crowd pushed law
enforcement back and got in their faces, shouting "Oathbreaker! Oathbreaker!" Jackson followed
the crowd that broke through the police line; he filmed others jumping through broken windows,
he walked past shattered glass on the floor of the Capitol when he unlawfully entered with a horde
of rioters, he knew the police had deployed tear gas, he knew they had used flashbang devices to
try and drive the crowd back, and he ignored the blaring alarm resonating through the Capitol.
Knowing all this, Jackson continues to use his newfound notoriety to spread false information to
his thousands of followers that the media coverage was false and that it was a "peaceful" protest.
It was not.

It is also worth noting that Jackson was not forthcoming with the U.S. Probation Officer
preparing the presentence investigation report in this case. As it indicates, "During the presentence

interview, Mr. Jackson advised his only social media presence is a Twitter account: @thejfkreport." This is especially ridiculous to claim when he posted on his publicly available Twitter account a picture of what appears to be a business card/bookmark that has no fewer than six social media accounts, including Twitter, Gab, Gettr, Telegram, YouTube, and Rumble.[31] The defendant also has two known accounts on Instagram (@jfkreport and @conservative_embassy, the latter being an account that he claims to co-run with an individual known as "CH").

 

*IMAGES 28, 29: Jackson's business card showing six different social media accounts. He reported only having one to his U.S. Probation Officer.*

## X.    The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in the Capitol siege, ranging from unlawful entry misdemeanors, such as in this case, to assault on law enforcement officers, to conspiracy to corruptly interfere with Congress.[32] Each offender must be sentenced based on their individual circumstances, but with the backdrop of the January 6 riot

---

[31] https://twitter.com/TheJFKReport/status/1423379802187206661

[32] Attached to this supplemental sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants. That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

in mind. Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment. The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021, were not minor crimes. A probationary sentence should not become the default.[33] Indeed, the government invites the Court to join Judge Lamberth's admonition that "I don't want to create the impression that probation is the automatic outcome here because it's not going to be." *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19; *see also United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 ("Judge Lamberth said something to the effect . . . 'I don't want to create the impression that probation is the automatic outcome here, because it's not going to be.' And I agree with that. Judge Hogan said something similar.") (statement of Judge Friedman).

Jackson has pleaded guilty to Count Four of the Information, charging him with willfully and knowingly parading, demonstrating, or picketing in any of the Capitol Buildings, a violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with

---

[33] Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC), *United States v. Douglas K. Wangler*, 1:21-cr-00365(DLF), and *United States v. Bruce J. Harrison*, 1:21-cr-00365(DLF). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(6), do apply, however.

For one thing, although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences—such as how a defendant entered the Capitol, how long they remained inside, the nature of any statements they made (on social media or otherwise), whether they destroyed evidence of their participation in the breach, etc.—help explain the differing recommendations and sentences. And as that discussion illustrates, avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement. *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

In considering disparity, a judge cannot "consider all of the sentences not yet imposed." *United States v. Godines*, 433 F.3d 68, 69–71 (D.C. Cir. 2006). "The most a judge can do is consider those other sentences that do exist," and "[t]he comparable sentences will be much smaller in the early days of any sentencing regime than in the later." *Id.*; *see generally United States v. Accardi*, 669 F.3d 340, 346 (D.C. Cir. 2012) ("Without more, two allegedly similar cases constitute too small a sample size to support a finding of an 'unwarranted disparity' in sentences."). In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6)."). Because the Sentencing Guidelines

do not apply here, the sentencing court cannot readily conduct a disparity analysis against a nationwide sample of cases captured by the Sentencing Guidelines.

Even in Guidelines cases, sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against law enforcement officials, and large number of victims. Thus, even though many of the defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

As the number of sentences in the Capitol breach misdemeanor cases increase and the pool of comparators grows, the effect on sentences of obviously aggravating considerations should become more apparent. The same is true for obviously mitigating factors, such as a defendant's efforts to prevent assaults on police.

No previously sentenced case contains the same balance of aggravating and mitigating factors present here. Jackson is uniquely prolific in his defiant continuation of posting conspiracy theories, giving interviews, and independently investigating members of the community. Accordingly, there are no perfectly comparable cases.

One comparison that could be made is to sentenced Capitol defendant Jennifer Ryan.[34] Similar to Jackson, she gave numerous interviews and made numerous outlandish claims,

---

[34] *United States v. Jennifer Ryan*, 21-CR-50 (CRC).

including expressing the ultimately misplaced belief that she would not be going to jail. She is someone who considers herself to be what is known as a social media influencer. Ryan posted many statements about fighting on the way to the Capitol, posted photos smiling after leaving, and gave television interviews and made posts about January 6, 2021, being the proudest day of her life. She posted that she will not go to jail because she is white and has blonde hair.[35] A judge disagreed and sentenced her to sixty days incarceration, the same term of incarceration the government seeks for Jackson. The government believes that probation is also necessary for Jackson due to his unique mental health concerns, his deeply rooted beliefs in conspiracy theories, and his propensity to act on them.

Another comparable case is that of the recently sentenced defendant Mark Leffingwell.[36] Leffingwell is also a disabled veteran, but unlike Jackson, Leffingwell engaged in acts of violence while at the Capitol, assaulting two members of law enforcement. In that case, the government recommended twenty-seven months incarceration and the court imposed a sentence of six months incarceration followed by a twenty-four-month period of supervised release. Since that plea involved a felony offense, the U.S.S.G. applied, a situation that we do not have here, but given Jackson's behavior during January 6 and after then, the government believes that its recommended sentence in this case is not discrepant to the sentence imposed in Leffingwell's case.

While there are many other cases with many other comparable aggravating and mitigating factors, for purposes of this memorandum, the final that the government will point to is that of Boyd Camper.[37] Like Jackson, Camper was charged with misdemeanor offenses. Camper also

---

[35]     https://www.washingtonpost.com/local/legal-issues/jenna-ryan-jail-capitol-jan-6/2021/11/04/c94cd8c2-3d82-11ec-8ee9-4f14a26749d1_story.html

[36] *United States v. Mark Leffingwell*, 21-CR-5 (ABJ).

[37] *United States v. Boyd Camper*, 21-CR-325 (CKK).

showed a complete lack of remorse after January 6 and gave a public interview where he called what he did an insurrection. The court in that case sentenced the defendant to two months incarceration.

The government also recommends that the Court impose the requirement to participate in a mental health treatment program and follow the rules and regulations of that program as authorized by 18 U.S.C. § 3563(b)(9).

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

### XI.    The Court's Lawful Authority to Impose a Split Sentence

The sentence requested by the government—sixty days of incarceration followed by thirty-six months' of probation—is a lawful one. A sentencing court may impose a "split sentence," meaning "a period of incarceration followed by period of probation," *Foster v. Wainwright*, 820 F. Supp. 2d 36, 37 n.2 (D.D.C. 2011) (citation omitted)—for a defendant convicted of a federal petty offense, such as the crime at issue in this case. *See* 18 U.S.C. § 3561(a)(3). In addition, for a

defendant convicted of any federal offense, a sentencing court may impose incarceration for a brief interval as a condition of probation under 18 U.S.C. § 3563(b)(10).

### a.  *A sentence imposed for a petty offense may include both incarceration and probation.*

i.  Relevant Background

In 1984, Congress enacted the Sentencing Reform Act, which in substantial part remains the sentencing regime that exists today. *See* Pub. L. No. 98–473, §§211-212, 98 Stat 1837 (1984), *codified at* 18 U.S.C. § 3551 *et seq.*; *see Mistretta v. United States*, 488 U.S. 361, 365-66 (1989) (noting that the Sentencing Reform Act of 1984 wrought "sweeping changes" to federal criminal sentencing). That legislation falls in Chapter 227 of Title 18, which covers "Sentences." Chapter 227, in turn, consists of subchapter A ("General Provisions"), subchapter B ("Probation"), subchapter C ("Fines"), and subchapter D ("Imprisonment). Two provisions—one from subchapter A and one from subchapter B—are relevant to the question of whether a sentencing court may impose a term of continuous incarceration that exceeds two weeks[38] followed by a term of probation, such as the sentence requested by the United States here.

First, in subchapter A, 18 U.S.C. § 3551 sets out "[a]uthorized sentences." Section 3551(a) makes clear that a "defendant who has been found guilty of" any federal offense "shall be sentenced in accordance with the provisions of" Chapter 227 "[e]xcept as otherwise specifically provided." 18 U.S.C. § 3551(a). Section 3551(b) provides that a federal defendant shall be sentenced to "(1) a term of probation as authorized by subchapter B; (2) a fine as authorized by subchapter C; or (3) a term of imprisonment as authorized by subchapter D." 18 U.S.C. § 3551(b).[39] As a general matter, therefore, "a judge must sentence a federal offender to either a fine,

---

[38] A period of incarceration that does not exceed two weeks followed by a term of probation is also permissible under 18 U.S.C. § 3653(b)(10). *See* Part V(b) *infra*.

[39] Section 3551(b) further provides that a sentencing judge may impose a fine "in addition to any other sentence." 18 U.S.C. § 3551(b).

a term of probation, or a term of imprisonment." *United States v. Kopp*, 922 F.3d 337, 340 (7th Cir. 2019).

Second, 18 U.S.C. § 3561, the first provision in subchapter B, addresses a "[s]entence of probation." As initially enacted, Section 3561 provided that a federal defendant may be sentenced to a term of probation "unless . . . (1) the offense is a Class A or Class B felony and the defendant is an individual; (2) the offense is an offense for which probation has been expressly precluded; or (3) the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense." Pub. L. No. 98-473, at § 212; *see United States v. Anderson*, 787 F. Supp. 537, 539 (D. Md. 1992) (noting that the Sentencing Reform Act did not permit "a period of 'straight' imprisonment . . . at the same time as a sentence of probation").

Congress, however, subsequently amended Section 3561(a)(3). In 1991, Congress considered adding the following sentence to the end of Section 3561(a)(3): "However, this paragraph does not preclude the imposition of a sentence to a term of probation for a petty offense if the defendant has been sentenced to a term of imprisonment at the same time for another such offense." H.R. Rep. 102-405, at 167 (1991). Instead, three years later Congress revised Section 3561(a)(3) by appending the phrase "that is not a petty offense" to the end of the then-existing language. *See* H.R. Rep. No. 103-711, at 887 (1994) (Conference Report). In its current form, therefore, Section 3561(a)(3) provides that a defendant "may be sentenced to a term of probation unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense." 18 U.S.C. § 3561(a)(3).

ii.   <u>Analysis</u>

Before Congress passed the Sentencing Reform Act of 1984, sentencing courts could impose a split sentence on a federal defendant in certain cases. *See United States v. Cohen*, 617 F.2d 56, 59 (4th Cir. 1980) (noting that a sentencing statute enacted in 1958 had as its "primary

purpose . . . to enable a judge to impose a short sentence, not exceeding sixth months, followed by probation on a one count indictment"); *see also United States v. Entrekin*, 675 F.2d 759, 760-61 (5th Cir. 1982) (affirming a split sentence of six months' incarceration followed by three years of probation). In passing the Sentencing Reform Act, Congress sought generally to abolish the practice of splitting a sentence between imprisonment and probation because "the same result" could be accomplished through a "more direct and logically consistent route," namely the use of supervised release as set out in 18 U.S.C. §§ 3581 and 3583. S. Rep. No. 225, 1983 WL 25404, at *89; *accord* United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") § 5B1.1, Background. But Congress's 1994 amendment to Section 3561(a)(3) reinstated a sentencing court's authority to impose a split sentence for a petty offense.

Under 18 U.S.C. § 3561, a defendant "may be sentenced to a term of probation unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense." 18 U.S.C. § 3561(a)(3). Thus, for any federal offense *other than* a petty offense, Section 3561(a)(3) prohibits "imposition of both probation and straight imprisonment," consistent with the general rule in Section 3551(b). *United States v. Forbes*, 172 F.3d 675, 676 (9th Cir. 1999); *see United States v. Martin*, 363 F.3d 25, 31 (1st Cir. 2004); *United States v. Harris*, 611 F. App'x 480, 481 (9th Cir. 2015); *Anderson*, 787 F. Supp. at 539.

But the statutory text of 18 U.S.C. § 3561(a)(3) goes further by permitting a court to sentence a defendant to a term of probation "unless" that defendant "is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense." 18 U.S.C. § 3561(a)(3). It follows that when a defendant *is* sentenced for a petty offense, that defendant may be sentenced to a period of continuous incarceration and a term of probation. *See United States v. Posley*, 351 F. App'x 807, 809 (4th Cir. 2009) (per curiam). In *Posley*, the defendant, convicted of

a petty offense, was sentenced to two years of probation with the first six months in prison. *Id.* at 808. In affirming that sentence, the Fourth Circuit concluded that Section 3561(a)(3) "[u]nquestionably" provided statutory authority to sentence the petty-offense defendant to "a term of six months of continuous imprisonment plus probation." *Id.* at 809; *see* Cyclopedia of Federal Procedure, § 50:203, *Capacity of court to impose probationary sentence on defendant in conjunction with other sentence that imposes term of imprisonment* (3d ed. 2021) ("[W]here the defendant is being sentenced for a petty offense, a trial court may properly sentence such individual to a term of continuous imprisonment for a period of time, as well as a sentence of probation.") (citing *Posley*); *see also* Wright and Miller, *Federal Practice and Procedure*, § 547, at n.13 (4th ed. 2021) ("A defendant may be sentenced to probation unless he . . . is sentenced at the same time to imprisonment for an offense *that is not petty*.") (emphasis added).

Nor does the phrase "that is not a petty offense" in Section 3561(a)(3) modify only "different offense." Section 3561(a)(3) does not state "the same *offense* or a different offense that is not a petty offense," which would imply that the final modifier—*i.e.*, "that is not a petty offense"—applies only to "different offense." The phrase "that is not a petty offense" is a postpositive modifier best read to apply to the entire, integrated phrase "the same or a different offense." *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 148 (2012). Had Congress sought to apply the phrase "not a petty offense" solely to "different offense," the "typical way in which syntax would suggest no carryover modification" would be some language that "cut[s] off the modifying phrase so its backward reach is limited." *Id.* at 148-49. And while the indefinite article "a" might play that role in other contexts (*e.g.*, "either a pastry or cake with icing" vs. "either a pastry or a cake with icing"), the indefinite article in Section

3561(a)(3) merely reflects the fact that the definite article before "same" could not naturally apply to the undefined "different offense."

Permitting a combined sentence of continuous incarceration and probation for petty offenses is sensible because sentencing courts cannot impose supervised release on petty-offense defendants. *See* 18 U.S.C. § 3583(b)(3); *United States v. Jourdain*, 26 F.3d 127, 1994 WL 209914, at *1 (8th Cir. 1994) (unpublished) (plain error to impose a term of supervised release for a petty offense). When Congress in 1994 amended the language in Section 3561(a), it again provided sentencing courts with "latitude," *see* S. Rep. 98-225, 1983 WL 25404, at *89, to ensure some degree of supervision—through probation—following incarceration.

Section 3551(b)'s general rule that a sentencing court may impose either imprisonment or probation (but not both) does not preclude a sentencing court from imposing a split sentence under Section 3561(a)(3) for a petty offense for three reasons. First, Section 3551(a) notes that the sentencing provisions described there apply "[e]xcept as otherwise specifically provided." Section 3561(a)(3) does "provide[]" "otherwise": it recognizes a carveout for petty offenses.

Second, the more specific permission for split sentences in petty offense cases in Section 3561(a)(3) prevails over the general prohibition on split sentences in Section 3551(b). *See Morton v. Mancari*, 417 U.S. 535, 550-51 (1974) ("Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one."). When Congress enacted the general prohibition on split sentences in Section 3551(b), it had not yet enacted the more specific carveout for split sentences in petty offense cases in Section 3561(a)(3). *See supra*, at 23 (recounting statutory history). That carveout does not "void" the general prohibition on split sentences in Section 3551(b); rather, Section 3551(b)'s general prohibition's "application to cases covered by the specific provision [in Section 3651(a)(3)] is suspended" as to petty offense cases. Scalia &

Garner, *supra*, at 184. In other words, Section 3551(b)'s prohibition against split sentences "govern[s] all other cases" apart from a case involving a petty offense. *Ibid.*

Third, to the extent Section 3551(b)'s general prohibition against split sentences conflicts with Section 3561(a)(3)'s permission for split sentences in petty offense cases, the latter, later-enacted provision controls. *See Posadas v. Nat'l Bank of N.Y.*, 296 U.S. 497, 503 (1936) ("Where provisions in the two acts are in irreconcilable conflict, the later act to the extent of the conflict constitutes an implied repeal of the earlier one."); Scalia & Garner, *supra*, at 327-329. Where a conflict exists "between a general provision and a specific one, whichever was enacted later might be thought to prevail." *Id.* at 185. "The "specific provision"—here Section 3561(a)(3)—"does not negate the general one entirely, but only in its application to the situation that the specific provision covers." *Ibid.* Section 3551(b)'s general prohibition does not operate against the more specific, later-enacted carveout for split sentences in Section 3561(a)(3).

An interpretation of Sections 3551(b) and 3561(a) that a sentencing court "must choose between probation and imprisonment when imposing a sentence for a petty offense," *United States v. Spencer*, No. 21-cr-147-CKK, Doc. 70 at 5 (Jan. 19, 2022), fails to accord the phrase "that is not a petty offense" in Section 3561(a)(3) any meaning. When Congress in 1994 amended Section 3561(a)(3) to include that phrase, it specifically permitted a sentencing court in a petty offense case to deviate from the otherwise applicable general prohibition on combining continuous incarceration and probation in a single sentence. Ignoring that amended language would improperly fail to "give effect to every clause and word" of Section 3561(a)(3). *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385 (2013).

Congress's unenacted language from 1991, *see supra*, at 23, does not suggest that a split sentence is available only where a defendant is sentenced at the same time for two different petty

offenses or for two offenses, at least one of which is a petty offense. For one thing, the Supreme Court has regularly rejected arguments based on unenacted legislation given the difficulty of determining whether a prior bill prompted objections because it went too far or not far enough. *See Mead Corp. v. Tilley*, 490 U.S. 714, 723 (1989) ("We do not attach decisive significance to the unexplained disappearance of one word from an unenacted bill because 'mute intermediate legislative maneuvers' are not reliable indicators of congressional intent.") (citation omitted). Moreover, under that view, every offense other than a petty offense could include some period of incarceration and some period of supervision (whether that supervision is supervised release or probation). Yet so long as a defendant was convicted of two petty offenses, that defendant could be sentenced to incarceration and supervision (in the form of probation). No sensible penal policy supports that interpretation.

It follows that a sentencing court may impose a combined sentence of incarceration and probation where, as here, the defendant is convicted of a petty offense. Here, Sunstrum pleaded guilty to one count of 40 U.S.C. § 5104(d): Stepping on, Climbing, Removing, or Injuring Property on U.S. Capitol Grounds, which is a "petty offense" that carries a maximum penalty that does not exceed six months in prison and a $5,000 fine. *See* 18 U.S.C. § 19; *see United States v. Soderna*, 82 F.3d 1370, 1381 n.2 (7th Cir. 1996) (Kanne, J., concurring) (citations omitted) (noting that a petty offender may face a sentence of up to five years in probation).

**b. *A sentence of probation may include incarceration as a condition of probation, though logistical and practical reasons may militate against such a sentence during an ongoing pandemic.***

i. Relevant Background

In 18 U.S.C. § 3563, Congress set out "[c]onditions of probation." 18 U.S.C. § 3563. Among the discretionary conditions of probation, a sentencing court may impose is a requirement that a defendant

> remain in the custody of the Bureau of Prisons during nights, weekends or other intervals of time, totaling no more than the lesser of one year or the term of imprisonment authorized for the offense, during the first year of the term of probation or supervised release.

18 U.S.C. § 3563(b)(10). Congress enacted this provision to give sentencing courts "flexibility" to impose incarceration as a condition of probation in one of two ways. S. Rep. No. 225, 1983 WL 25404, at *98. First, a court can direct that a defendant be confined in "split intervals" over weekends or at night. *Id.* Second, a sentencing court can impose "a brief period of confinement" such as "for a week or two." *Id.*[40]

    ii.   <u>Analysis</u>

    A sentencing court may impose one or more intervals of imprisonment up to a year (or, as here, up to the six-month statutory maximum) as a condition of probation, so long as the imprisonment occurs during "nights, weekends or other intervals of time." 18 U.S.C. § 3653(b)(10). Although the statute does not define an "interval of time," limited case law suggests that it should amount to a "brief period" of no more than a "week or two" at a time. *United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history described above and reversing magistrate's sentence that included 30-day period of confinement as a condition of probation); *accord United States v. Baca*, No. 11-1, 2011 WL 1045104, at *2 (C.D. Cal. Mar. 18, 2011) (concluding that two 45-day periods of continuous incarceration as a condition of probation was inconsistent with Section 3563(b)(10)); *see also Anderson*, 787 F. Supp. at 538 (continuous 60-day incarceration not appropriate as a condition of probation; *Forbes*, 172 F.3d at 676 ("[S]ix months is not the intermittent incarceration that this statute permits."). Accordingly, a sentence of up to two weeks'

---

[40] Section 3563(b)(10)'s legislative history notes that imprisonment as a term of probation was "not intended to carry forward the split sentence provided in Section 3561, by which the judge imposes a sentence of a few months in prison followed by probation." S. Rep. No. 225, 1983 WL 25404, at *98.

imprisonment served in one continuous term followed by a period of probation is permissible under Section 3563(b)(10).[41]  That would be an appropriate sentence in this case.

A sentencing court may also impose "intermittent" confinement as a condition of probation to be served in multiple intervals during a defendant's first year on probation. 18 U.S.C. § 3563(b)(10); *see Anderson*, 787 F. Supp. at 539. Notwithstanding a sentencing court's legal authority to impose intermittent confinement in this manner, the government has refrained from requesting such a sentence in Capitol breach cases given the potential practical and logistical concerns involved when an individual repeatedly enters and leaves a detention facility during an ongoing global pandemic. Those concerns would diminish if conditions improve or if a given facility is able to accommodate multiple entries and exits without unnecessary risk of exposure. In this case, the government does not request that imprisonment be imposed through "intermittent" confinement as a condition of probation.

**[THIS SPACE INTENTIONALLY LEFT BLANK]**

---

[41] Section 3563(b)(10)'s use of the plural to refer to "nights, weekends, or intervals of time" does not imply that a defendant must serve multiple stints in prison. Just as "words importing the singular include and apply to several persons, parties, or things," "words importing the plural include the singular." 1 U.S.C. § 1; *see* Scalia & Garner, *supra*, at 129-31.

## XII.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. As explained herein, although many of those factors would normally support a significant sentence of incarceration, balancing the factors, the government recommends that this Court sentence Micajah Joel Jackson to sixty days incarceration; thirty-six months' probation (to include compliance with mental health treatment), and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty because of his behavior, while recognizing his early acceptance of responsibility.

Respectfully submitted,

MATTHEW M. GRAVES
D.C. BAR NO. 481052
ACTING UNITED STATES ATTORNEY

By:   _____
Sean P. Murphy
D.C. Bar No. 1187821
Assistant United States Attorney
U.S. Attorney's Office—District of Puerto Rico
Torre Chardon, Ste 1201
350 Carlos Chardon Avenue
San Juan, PR 00918
787-766-5656
sean.murphy@usdoj.gov